## BOARD OF LIQUIDATION OF THE CITY DEBT OF NEW ORLEANS *v.* LOUISVILLE AND NASHVILLE RAILROAD COMPANY · and Another.

APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE EASTERN DISTRICT OF LOUISIANA.

Argued October 18th and 19th, 1883.—Decided November 12th, 1883.

*New Orleans—Statutes of Louisiana.*

In the absence of fraud, a compromise made between the city authorities of New Orleans and a railroad company, respecting a disputed grant of a user of part of the city property, known as the Batture, for railroad purposes, was sustained, as authorized by the laws of Louisiana. Under the statutes of that State, the city authorities had the right to make the compromise at the time it was made, and it remained valid, notwithstanding the powers conferred upon the board of liquidation of the city debt of New Orleans, by the legislature.

The long record in this case presents no subject of general interest outside of the important special issues involved in the suit. The facts upon which the decision rests are fully set forth in the opinion of the court.

*Mr. Richard T. Merrick* and *Mr. Henry C. Miller* for the appellant; and

*Mr. Thomas L. Bayne,* for the appellees.

MR. CHIEF JUSTICE WAITE delivered the opinion of the court.

This appeal presents the following case:

Prior to the year 1820 disputes had arisen between the city of New Orleans and certain proprietors of riparian estates, as to the ownership of the batture or alluvion in front of the city

on the Mississippi River. In compromise of these disputes the proprietors surrendered to the city all their claims to property within certain boundaries.

In 1869 the legislature of Louisiana undertook, by act No. 26 of 1869, to grant to the New Orleans, Mobile & Chattanooga Railroad Company, now by change of name the New Orleans, Mobile & Texas Railroad Company, "the right to locate, construct, maintain, and use a passenger depot with offices and apartments suitable for its legitimate business, upon that part or portion of the levee or streets and grounds in the city of New Orleans bounded by Canal, Delta, and Poydras streets and a line parallel to and one hundred and fifty feet easterly from Delta street; and for the construction of a freight depot, and for other purposes of its legitimate business, to inclose and occupy the blocks of grounds, parts of streets, and portion of levee in said city bounded by Girod, Water, and Calliope streets and a line parallel to and two hundred and ninety feet easterly from Water street, provided said company shall not inclose or occupy that part or portion of the blocks of ground within said last limits which is the private property of individuals until said company has acquired the title thereto; and said company shall thereafter, if requested by said city, extend the wharf in front thereof equal with the present wharf in front of the northerly corner of the outer block within said limits, recently sold by said city and now owned by said company."

The validity of this act was disputed by the city, and suits were brought by the company in a State court to establish the grant. These suits resulted in judgments, which, as the company claimed, confirmed its title. The city denied that such was the effect of the judgments, and attempted to tear down and destroy the fences and other structures of the company. Thereupon the company, on the 8th of July, 1874, brought another suit to enjoin the city. This suit resulted in a decree by the Circuit Court of the United States for the District of Louisiana, on the 11th of June, 1878, allowing the injunction prayed for. From that decree the city, on the 30th of July, 1878, appealed to this court, and the appeal was docketed on the 16th of December following.

During the pendency of this suit in this court the legislature of Louisiana passed act No. 133 of 1880, creating a board of liquidation of the city debt "for the purpose of liquidating, reducing, and consolidating the debt of the city of New Orleans." By this act it was provided that the board thus created should "have exclusive control and direction of all matters relating to the bonded debt of the city of New Orleans," and authority to issue new bonds of the city, to be exchanged for old at the rate of fifty cents of new for one dollar old.

Section 5 of that act is as follows:

"SECT. 5. That it shall be the duty of the city authorities, as soon as possible, after the organization of the board of liquidation of the city debt, to turn over and transfer to the said board all the property of the city of New Orleans, both real and personal, not dedicated to public use ; and the board of liquidation shall be, and is hereby, empowered and authorized to dispose of said property on such terms and conditions as may be deemed favorable ; the proceeds of such sale or sales to be deposited with the fiscal agents of the board at credit of 'city debt fund.'"

No new bonds were ever issued by the board of liquidation under this authority, and the city never actually transferred to the board any of the batture property. Neither did the board ever assume control of such property. A reason given for this by the president of the board, and suggested by the counsel for the appellant in his argument, is, that fears were entertained that if property not dedicated to public uses should be actually separated and set apart from that which was, judgment creditors of the city might levy their executions and subject such as was thus shown not to be required for public use to the payment of their judgments.

On the 23d of June, 1882, act No. 20, of 1882, was passed by the legislature of Louisiana, "to incorporate the city of New Orleans, provide for the government and administration of the affairs thereof, and to repeal all acts inconsistent and in conflict with its provisions."

Secs. 8, 28, and 78 of this act are as follows :

" SEC. 8. The council shall also have power . . . to authorize the use of streets for horse and steam railroads and to regulate the same ; to require and compel all lines of railway or tramway in any one street to run on and use one and the same track and turn-table ; to compel them to keep conductors on their cars, and compel all such companies to keep in repair the street bridges and crossings through or over which their cars run ; to lay off and sell in lots or squares so much of the batture, from time to time, as may not be required for public purposes, but the right of accretion or to future batture shall never be sold.

" SEC. 28. That all the rights, titles, and interest of the city of New Orleans, as now existing in and to all lands, tenements, hereditaments, bridges, ferries, streets, roads, wharves, markets, stalls, levees, and landing places, buildings and other property of whatever description, and wherever situated, and with all goods, chattels, moneys, effects, debts, dues, demands, bonds, obligations, judgments and judgment liens, actions and rights of actions, books, accounts, and vouchers, be and they are hereby vested in the city of New Orleans, as incorporated by this act.

" SEC. 78. All laws in conflict, inconsistent, or contrary to the provisions of this act, be and the same are hereby repealed."

By Act No. 58 of 1882, passed June 30th, 1882, entitled " An Act to authorize the city of New Orleans to renew and extend payment of her outstanding bonds, other than premium bonds, to provide the rate of interest on the bonds as reduced or extended, and authorize the levy of a tax to pay the same," the board of liquidation was " authorized and empowered to extend the bonded indebtedness of said city, other than premium bonds, outstanding at the passage and promulgation of this act, for the period of forty years from January 1st, 1883, at a rate of interest not exceeding six per cent."

On the 5th of July, 1882, Act No. 81 of 1882 was passed and approved, a copy of which is as follows :

" Act No. 81 of 1882, entitled an act to authorize the city of New Orleans in the sale or lease of franchise, or right of way for

street railroads, or other privilege, to apply the price paid for the same in the performance of works of public improvements of a permanent character, such as paving streets, embellishing parks, etc.

" Whereas, notice as required by article 48 of the Constitution has been given of the intention to apply for the passage of this act ; therefore,

SEC. 1. Be it enacted by the General Assembly of the State of Louisiana, That hereafter, whenever the city of New Orleans, through the proper authorities, shall contract with private corporations or individuals for the sale or lease of public privileges or franchises, such as the rights of way for street railroads, or for other public undertakings within her legal power and control, the price paid for the sale or lease of public privileges or franchises shall be applied by said city in the performance of works of public improvement of a permanent character, such as paving streets, embellishing parks, etc.

" SEC. 2. Be it further enacted, That all laws or parts of laws, and especially so much of section 10 of act No. 31, acts of 1876, known as the premium-bond act, and by section 5 of act No. 133, acts of 1880, as may be in conflict herewith, be, and the same are hereby, repealed."

Such being the legislative authority of the different departments of the city government, a resolution was passed by the city council on the 11th of October, 1882, accepting a proposition of the railroad company to compromise and settle all the matters in controversy in the suit pending in this court on appeal, by which the company was to pay the city $40,000, and the city was to dismiss its appeal and acquiesce in the decree of the circuit court. The negotiations which resulted in this compromise began as early as August 1st, 1882, when the council appointed a committee to confer with the railroad company on the subject. The money stipulated for in the compromise was paid on the 11th of October, 1882, and on the same day an agreement of compromise, dismissing the appeal and acquiescing in the decree appealed from, was duly signed and executed by the mayor of the city under the authority of the council. On the next day the board of liquidation noti-

fied the city authorities that it claimed the fund realized from this settlement. On the 13th of October a resolution of the board was adopted to the effect "that the $40,000 now in the hands of the administrator of finance be enjoined and the attorney be directed to institute legal proceedings at once." On the 17th of October the resolution of the 13th was so far modified as "to authorize the attorney of the board to take such steps as, in his judgment, are requisite to set aside the agreement of compromise; . . . to oppose the dismissal of the appeal, and to hold the fund decreed from said compromise so as to restore it if the compromise is annulled, or to claim it for the board if said compromise becomes a finality."

On the 10th of October, 1882, the suit pending in this court was continued at the request of the parties, but at a later day in the term the railroad company appeared and presenting a stipulation for the dismissal of the appeal, signed by the city attorney of New Orleans pursuant to the terms of the compromise, asked to have the appropriate order entered upon that stipulation. Thereupon the board of liquidation came and resisted the entry of any such order, on the ground that during the pendency of the appeal authority over the subject-matter of the controversy had been transferred from the city council to the board, and that the compromise which had been effected was not binding. The board also asked leave to prosecute the appeal in the name of the city. It was conceded that the city council made the compromise which was claimed, and that the railroad company was entitled to a dismissal of the appeal if the council had authority to do what was done, and the compromise was fair. This court thought the dispute as to the authority of the council presented questions too important to be settled summarily on motions, and ordered the motions to be continued until the present term, when the appeal would be dismissed in accordance with the stipulation, unless the board should begin and prosecute without unnecessary delay, in some court of competent jurisdiction, an appropriate suit to set aside the compromise. This suit was brought for that purpose, and the Circuit Court for the Eastern District of Louisiana, on full consideration, entered a decree dismissing the bill. To reverse

that decree this appeal was taken, and the single question to be decided is, whether, upon these facts, the board of liquidation is entitled to the relief it has prayed for.

There is no pretence of fraud, either on the part of the city council or the railroad company. So far as appears, the negotiations were carried on by both parties openly and without any attempt at concealment. The board of liquidation does not even allege that it was ignorant of what was being done.

The whole case, therefore, turns on the legislative authority of the city council to bind the city by a compromise of the suit, and about this we have no doubt. Under act No. 133 of 1882, the city authorities were only required to turn over to the board such property as was not dedicated to public use. It was substantially conceded on the argument that if the railroad was removed the property between Poydras and Canal streets would immediately be put to such use, and it is by no means certain that this may not be true of some or all the rest. All except that between Poydras and Canal streets has been formed into squares, but the control of it was never assumed by the board. The fact that fears were entertained that if such control should be assumed the property would be levied on and sold under executions against the city, is very persuasive evidence to show that it was apparently property dedicated to public use, though occupied to some extent by the railroad company for its tracks and passenger and freight stations.

But however this may be, we are entirely satisfied that under the legislation of 1882 the city council had full authority to bind the city by a compromise of the pending suit. Confessedly no bonds were ever issued, or obligations incurred, by the board of liquidation under act No. 133 of 1880; and on the 23d of June, 1882, the city council was, in express terms, authorized to lay off and sell, in lots or squares, so much of the batture, from time to time, as might not be required for public purposes. Then, on the 5th of July, only a few days later, the city was authorized, through its proper authorities, to contract with private corporations for the sale or lease of public privileges or franchises, such as rights of way for street

railroads, or for other public undertakings within her legal power and control, the price paid to be applied by the city "in the performance of works of public improvement of a permanent character." All this is entirely inconsistent with the provisions of sec. 5 of act No. 133 of 1880, at least so far as the control and disposition of batture property are concerned. The repealing sections of these acts, therefore, operated directly on the powers of the board over the subject-matter of this compromise, and left the city council free to act in the premises.

It must be borne in mind that all the legislation involved relates to the distribution of the powers of the city government among the different departments. As the question is presented to us no contract rights need protection. Whether the board of liquidation is a corporation that can sue in its own name or that can be sued is not at all important, for even if it be a corporation, it is in effect nothing more than one of the departments of the city government charged with the duty of controlling and directing matters relating to the bonded debt. Even though the effect of section 5 of the act of 1880 was to pledge the property of the city not dedicated to public use to secure the payment of the public debt, there was nothing to prevent the legislature from revoking the pledge until contract rights had in some way intervened. It is agreed that no new bonds were ever issued by the board under the authority or upon the faith of the act of 1880 before the new charter was granted, and act No. 81 of 1882 was passed before anything was done in the way of extending or renewing bonds under act No. 58 of the same year.

The result of the whole legislation is, therefore, that in 1880 the board of liquidation was created and given power to dispose of and sell the property of the city not dedicated to public uses, and out of the proceeds pay the public debt; but before any new rights had accrued under this power, the control and disposition of batture property not needed for public purposes was withdrawn from the board and given to the city council, and the proceeds of the sales and leases of public privileges and franchises were appropriated to the payment of the expenses of public improvements which

were permanent in their character. Whether the money realized from this compromise is to be applied to the payment of the public debt or to make permanent improvements, we do not undertake to decide, but that the compromise itself was within the departmental authority of the city council, and not subject to the control of the board of liquidation, is to our minds clear.

It follows that the circuit court was right in refusing to set aside the compromise.

*Decree affirmed.*