**GUINNESS PLC; Guinness America, Incorporated, Plaintiffs–Appellees,**

v.

**Thomas Joseph WARD, Defendant–Appellant. (Two Cases)**

Nos. 90–1869, 90–1870.

United States Court of Appeals, Fourth Circuit.

Argued May 9, 1991.

Decided Jan. 28, 1992.

As Amended March 10, 1992.

Thomas Joseph Ward, Sr., Ward, Lazarus & Grow, Washington, D.C., argued (Harold R. Bruno, III, on brief), for defendant-appellant.

Rebecca Ellen Swenson, Arnold & Porter, Washington, D.C., argued (Richard J. Wertheimer, on brief), for plaintiffs-appellees.

Before HALL, Circuit Judge, HALLANAN, District Judge for the Southern District of West Virginia, sitting by designation, and KELLAM, Senior District Judge for the Eastern District of Virginia, sitting by designation.

## OPINION

HALLANAN, District Judge:

Defendant–Appellant Thomas Joseph Ward [hereinafter referred to as "Ward"] appeals from the district court's grant of summary judgment for the Plaintiffs–Appellees Guinness PLC and Guinness America, Incorporated, [hereinafter collectively referred to as "Guinness"] on Guinness' complaint and Ward's counterclaim.

### I.

Guinness initiated this action on February 9, 1988, in the United States District Court for the District of Maryland seeking

recognition and enforcement of a foreign money judgment entered by the High Court of Justice in London, England, [hereinafter referred to as "High Court"] in favor of Guinness and against Ward in the amount of 5.2 million pounds sterling plus interest. The English judgment resulted from litigation against Ward for his alleged part in a financial scandal arising out of perhaps the largest takeover battle in English history.

In April of 1986, Guinness, a major European beer and alcohol producer and worldwide distributor, succeeded in a takeover of a Scottish competitor, Distillers PLC. Within a year's time, however, what initially appeared as a great triumph for Guinness turned to tragedy as investigations by various British regulatory and law enforcement agencies uncovered a financial scandal involving the top echelons of Guinness' management. By January, 1987, Ernest Saunders, Guinness' Chairman and Chief Executive Officer, and Oliver Roux, its Chief Financial Officer, as well as others, had been forced to leave Guinness and were replaced by new management.

Ward, the senior partner of the Washington, D.C., law firm of Ward, Lazarus & Grow and a practicing attorney for over 20 years, served as a director for Guinness as well as a legal advisor at the time of Guinness' takeover of Distillers PLC. On March 18, 1987, Guinness issued a writ against Ward and Ernest Saunders in the High Court and applied for what is known in England as a *Mareva* injunction. More specifically, Guinness contested a 5.2 million pounds sterling payment which Ward and Saunders allegedly had arranged for Guinness to make to a company incorporated in the Isle of Jersey and known as Marketing and Acquisition Consultants LTD. [hereinafter referred to as "MAC"] after discovering that MAC was controlled by Ward and that the payment had been made for Ward's benefit.

Guinness contends that a *Mareva* injunction is similar to a temporary restraining order and that it sought such an injunction due to its fear that Ward and Saunders would remove or otherwise dissipate the payment or alienate the proceeds thereof. A *Mareva* injunction was granted *ex parte* by Mr. Justice Warner of the High Court on the same day that such injunction was requested.

The injunction prohibited Ward and Saunders from removing or dissipating the payment or alienating any proceeds obtained therefrom. The injunction also prohibited Ward and Saunders from removing or dissipating their assets except insofar as they exceeded the value of 5.2 million pounds sterling and directed them to transfer the payment or any property acquired thereby which was in the control of the Court to Guinness' solicitors.[1] Guinness agreed to abide by any subsequent order regarding damages Ward might be held to have sustained as a result of the injunction.

The restrictions were to remain effective until March 25, 1987, or until further order of the court. Ward and Saunders were also directed to swear an affidavit by March 25, 1987, revealing the whereabouts of the payment or any property acquired thereby, the nature and date of every transaction involving the payment, and the value, nature and location of any assets within the court's jurisdiction. Furthermore, Ward and Saunders were to take all reasonable steps to discover the whereabouts of the payment or property acquired thereby and to bring such payment or property within the court's jurisdiction.

Ward and Saunders were permitted to apply immediately after receiving notification of the injunction's entry to the High Court for relief or modification of its terms. Saunders appeared before the High Court on March 19, 1987, while Ward appeared through English counsel[2] the next day. Through such appearances Ward and

---

1. In an effort to comply with the injunction, Ward transferred approximately $2 million to London. Ward contends that such amount was all that remained from the payment. The $2 million was placed in escrow once transferred to London.

2. Ward contends that he chose not to return to England and appear personally before the High Court so as to not jeopardize alleged meritorious defenses to any attempt to extradite him for statutory violations allegedly unique to England.

Saunders were successful in obtaining several modifications of the injunction as well as additional time in which to serve defenses and respond to the reporting obligations.

On April 1, 1987, Ward submitted an affidavit with exhibits to the High Court. In addition to challenging the propriety of the *Mareva* injunction and conceding his control over MAC and receipt of the payment, Ward contended that such payment had been proper and made pursuant to a contingent fee agreement under which he was to receive for his legal services a fee of ⅕ of 1% of the value of the takeover bid in the event that Guinness' takeover of Distillers PLC was successful.

An additional hearing was held before the High Court between April 8 and April 14, 1987, on the question of whether the orders granting the *Mareva* injunction and subsequent modifications should be extended through the trial or until further order. Ward appeared at such hearing through his English counsel and was so represented throughout the remainder of the High Court litigation. On May 13, 1987, Ward filed a counterclaim with the High Court in which he asserted a claim for the reasonable value of the legal services he allegedly performed on behalf of Guinness.

Guinness responded by filing a motion for summary judgment against Ward on May 15, 1987, and a motion for judgment on admissions against Ward on July 1, 1987. On July 17, 1987, the Vice Chancellor of the High Court granted Guinness' motion for judgment concluding that Ward's receipt of the payment via MAC was unlawful under the English Companies Act of 1985 and constituted a breach of the fiduciary duties which Ward owed Guinness as a Guinness director. Ward timely appealed the High Court judgment to the British Court of Appeal.

Guinness then initiated a suit in the District of Columbia involving in part an attorney's lien which Ward's law firm had asserted against Guinness due to alleged nonpayment of legal fees. Ward contends that "[d]uring the pendency of that suit and [his] British appeal, Guinness and [he] engaged in negotiations aimed at achieving a 'global settlement' of all of the disputes." Ward further contends that such negotiations resulted in an agreement which settled all of the parties' disputes in London, the Isle of Jersey[3] and Washington, D.C.

Guinness allegedly, however, disavowed and repudiated this agreement only to shortly thereafter begin negotiations with Ward anew. As stated by the district court below concerning the new negotiations

[t]here is no dispute that the parties indeed entered into settlement negotiations. The settlement discussed by the parties provided that Ward would be entitled to retain sufficient assets necessary to meet his large debts, certain specified major assets, and $100,000.00 of liquid assets, and Guinness would receive the remainder of Ward's assets. Guinness, however, refused to assent to any settlement until it had some idea of the nature of Ward's assets that it would be receiving under the agreement. Thus, Guinness insisted that Ward provide full documentation of his assets and liabilities.

Ward, however, was unwilling to simply disclose to Guinness extensive financial information concerning the nature and location of his assets, with Guinness being permitted thereafter to refuse to consummate the settlement. Ward feared that Guinness would acquire financial information, refuse to settle, and then begin collection on the assets identified by Ward.

The parties negotiated for an extensive period of time, eventually entering into a letter agreement on October 12, 1987. According to Ward, the "letter agreement ... outlined the terms of the settlement and the procedures that would be followed in consummating the agreement." In accordance with the agreement, Ward made a series of financial disclosures concerning his assets. The date on which Guinness could back out of

---

**3.** Prior to its initiation of the British High Court litigation, Guinness had also brought a suit against Ward and MAC in the Isle of Jersey, MAC's place of incorporation.

the Settlement Agreement based on Ward's financial disclosures passed without Guinness withdrawing. Although agreeing to the settlement generally as outlined, Guinness modified the agreement, reserving certain exceptions or limited reasons based on which Guinness could subsequently properly refuse to consummate the settlement. Specifically, because Ward had agreed to transfer shares of a corporation, the value of which was not obvious from the mere description of that asset, Guinness wanted to obtain additional information about the corporation. At that point, Guinness could still refuse to consummate the settlement, but only if Ward's financial disclosures proved untrue, or if, following the subsequent disclosure of the identity [sic] corporation, Guinness was unsatisfied with the asset.

Towards the end of November, 1987, Guinness needed shares of stock in Richter Brothers that were subject to the valid lawyer's lien of Ward Lazarus. Guinness represented that if Ward Lazarus immediately transferred the Richter Brothers' stock for an advance payment of $100,000.00 on outstanding legal fees, the agreement would in fact be consummated, and that if Ward Lazarus refused, the agreement would not be consummated. On this basis, Ward Lazarus transferred the Richter Brothers stock.

After Guinness received information about the corporations to be transferred and decided to proceed, subject only to confirming the accuracy of the information, an initial draft of the final settlement papers were circulated on December 3, 1987. Guinness, on advice of lead American counsel, refused to consummate [sic] settlement unless a revision was made to the tax refund portion of the agreement. The revision was made and a final agreement existed with the one caveat being that Guinness would first be permitted to visit the corporation, owned in part by Ward, that would be transferred to Guinness. One of Guinness' American counsel visited the corporation and confirmed the representations made to Guinness to that date.

Counsel for Guinness then informed counsel for Ward that he would travel to London to secure the official Board approval of the agreement. However, after arriving in London, counsel for Guinness informed counsel for Ward that Guinness was no longer willing to consummate the agreement. Ward contends that Guinness "breached" the agreement to conform to the desires of the British government.

As to the parties' pending litigation, the preliminary letter agreement reached by the parties had provided that

Ward will dismiss with prejudice all counterclaims asserted against Guinness in the High Court litigation and Guinness (i) will take such steps as are necessary and agreed upon by the parties to render the High Court judgment against Ward unenforceable, and to preclude further proceedings by Guinness against Ward and M.A.C. in the Jersey action, including, but not limited to, wherever possible and not inconsistent with the last sentence of this paragraph, dismissal without prejudice and a covenant not to enforce the High Court judgment against Ward....

Guinness commenced this action in the United States District Court for the District of Maryland on February 9, 1988, seeking recognition and enforcement of the British High Court money judgment pursuant to the Maryland Uniform Foreign Money–Judgments Recognition Act, Md.Cts. & Jud.Proc.Code Ann. § 10–701, *et seq.* Ward responded on April 25, 1988, by filing an answer containing numerous defenses and a three count counterclaim.

Among Ward's various defenses, those relevant to this appeal include contentions that the High Court judgment was not entitled to recognition and enforcement due to the post judgment settlement, or, as also referred to by Ward, accord and satisfaction, reached by the parties resolving their disputes; that if the parties had not actually consummated a binding settlement, Guinness' statements and actions during the negotiations and Ward's reliance upon them invoked the applicability of the doc-

trines of promissory estoppel, equitable estoppel and unclean hands; and that due to *ex parte* contacts between Guinness and the British High Court and the excessive requirements imposed by the *Mareva* injunction, Ward was denied a fair and impartial tribunal and proceedings comporting with the requirements of due process. Ward's allegations that a settlement had been reached and breached by Guinness, or, in the alternative, that the doctrine of promissory estoppel should prevent Guinness from denying the existence of such a settlement also constituted two counts of Ward's three count counterclaim.

Because of Guinness' alleged breach of the settlement, Ward contends that he continued his appeal of the High Court judgment through the British appellate courts, rather than dismissing it pursuant to the settlement, so as to mitigate his potential damages. Oral argument was held before the British Court of Appeal from April 26 to April 28, 1988. On May 10, 1988, the Court of Appeal affirmed the High Court judgment and concluded that Ward did breach his fiduciary duty as a Guinness director by failing to disclose his interest in the MAC payment to Guinness' full board of directors. Although the Court of Appeal also denied Ward's request for leave to appeal to the House of Lords, Ward successfully petitioned the House of Lords for such leave and oral argument was heard on his appeal between October 30 and November 7, 1989. On February 8, 1990, the Law Lords unanimously affirmed the Court of Appeal's affirmance of the High Court judgment on the grounds that the payment to MAC was *ultra vires* Guinness' articles of association. It is undisputed that Ward never informed the High Court, Court of Appeal or House of Lords of the settlement allegedly reached during the pendency of his appeal to the Court of Appeal.

On July 7, 1988, Guinness filed a motion for summary judgment on its complaint before the district court. Guinness supported its motion with the affidavit of its British counsel, Richard Alan Field, Q.C., who represented it in the English proceedings. Ward then filed a cross-motion for summary judgment on Guinness' complaint which he supported with his own declarations as well as those of his British counsel who represented him in the English proceedings and his American counsel who represented him in the district court.

Rejecting Ward's various defenses, the district court granted Guinness summary judgment on its complaint on August 24, 1990. More specifically, the court concluded that a post judgment accord and satisfaction is not one of the bases under the Maryland Uniform Foreign Money–Judgments Recognition Act upon which a court could refuse to recognize and enforce a foreign money judgment. The court also concluded, without explanation but apparently on grounds of *res judicata*, that "[a]fter Guinness failed to consummate the Settlement Agreement and proceeded to defend against Ward's appeals, it was incumbent upon Ward to notify the Court of Appeal of the alleged breach." Furthermore, the court concluded that Ward had failed to raise a genuine issue of material fact supporting his contention that the High Court judgment should not be recognized and enforced because it was not rendered by a fair and impartial tribunal utilizing procedures compatible with the requirements of due process of law.

In light of its victory, Guinness next moved for summary judgment on Ward's counterclaim on September 5, 1990. The district court granted Guinness' motion for summary judgment on October 2, 1990, concluding that the doctrine of *res judicata* precluded Ward from raising the alleged post judgment settlement as a counterclaim in the recognition and enforcement proceeding since Ward could have raised it during the British litigation.[4] Ward timely appealed the district court's orders granting summary judgment. By Order entered on December 4, 1990, his appeals were consolidated.

---

**4.** The district court entered an order certifying its August 24, 1990, order pursuant to Fed. R.Civ.P. 54 on August 31, 1990. Ward subsequently filed a motion to reconsider the August 24 and 31 orders which was denied on October 11, 1990.

## II.

Ward essentially raises three issues on appeal, the first two of which are closely related insofar as they both address rulings of the district court regarding Ward's right to raise the alleged post judgment settlement of the parties' disputes.

More specifically, Ward contends in his first issue on appeal that the district court erred in concluding as a matter of law that a Maryland recognition court would not consider as a defense a post judgment settlement in determining whether a foreign money judgment should be recognized and enforced because it is not one of the express bases set forth in the Maryland Uniform Foreign Money–Judgments Recognition Act for nonrecognition. He then argues in his second and related issue on appeal that the district court also erred in ruling that he was barred by the doctrine of *res judicata* from raising the post judgment settlement as a defense and counterclaim to Guinness' action for recognition and enforcement of the High Court judgment.

Ward addresses as error in his third and final issue on appeal the district court's finding that he had failed to raise a genuine issue of material fact to support his contention that the High Court judgment is not entitled to recognition and enforcement under the Maryland Uniform Foreign Money–Judgments Recognition Act, § 10–704(a)(1), because it was neither rendered by a fair and impartial tribunal nor was he afforded procedures compatible with the requirements of due process of law.

Our analysis of the issues, to be presented, *infra,* leads us to the following conclusions: As to Ward's first issue on appeal, we disagree with the district court's interpretation and application of the Maryland Uniform Foreign Money–Judgments Recognition Act to the extent that it holds as a matter of law that a post judgment settlement cannot be raised in any fashion under the Act as a defense to the recognition and/or enforcement of a foreign money judgment. As to Ward's second issue on appeal, however, we agree that Ward should be estopped and/or precluded from raising the alleged post judgment settlement reached during the pendency of his British appeal as a defense and counterclaim to Guinness' action seeking recognition and enforcement of the High Court judgment due to his failure to notify the British Court of Appeal of such settlement. However, we base our decision on the related but distinct ground of judicial estoppel rather than on the doctrine of *res judicata.* In regard to Ward's third and final issue on appeal, we believe that the district court correctly concluded that Ward failed to raise a genuine issue of material fact concerning his contention that the High Court judgment is not entitled to recognition and enforcement because it was neither rendered by a fair and impartial tribunal nor was he accorded procedures comporting with the requirements of due process.

## III.

We begin our analysis of the issues presented by noting that on appeal we review *de novo* a district court's grant of summary judgment. *Higgins v. E.I. Du-Pont de Nemours & Co.,* 863 F.2d 1162, 1167 (4th Cir.1988). Fed.R.Civ.P. 56(c) provides that "[summary judgment] shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." As noted by the district court, the standards for granting summary judgment are generally well defined. *See Celotex Corp. v. Catrett, Inc.,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

In assessing a motion for summary judgment, a court "must perform a dual inquiry into the *genuineness* and *materiality* of any purported factual issues." *Ross v. Communications Satellite Corp.,* 759 F.2d 355, 364 (4th Cir.1985). "As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly

preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510. While "[g]enuineness means that the evidence must create fair doubt; wholly speculative assertions will not suffice." *Ross*, 759 F.2d at 364; *accord Goldberg v. B. Green & Co., Inc.*, 836 F.2d 845, 848 (4th Cir.1988); *Felty v. Graves–Humphreys Co.*, 818 F.2d 1126, 1128 (4th Cir.1987); *Ash v. United Parcel Service, Inc.*, 800 F.2d 409, 411–12 (4th Cir.1986). Thus, upon reviewing all evidence presented regarding any alleged genuine issue of material fact:

> [t]he judge must ask himself not whether he thinks the evidence unmistakably favored one side or the other but whether a fair-minded jury could return a verdict for the [nonmovant] on the evidence presented. The mere existence of a scintilla of evidence in support of the [nonmovant's] position will be insufficient; it must be evidence on which the jury could reasonably find for the [nonmovant].

*Anderson*, 477 U.S. at 252, 106 S.Ct. at 2512.

Of course, however, when examining the record the court must be ever mindful that all justifiable inferences must be drawn in favor of the nonmoving party for "[c]redibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge". *Anderson*, 477 U.S. at 255, 106 S.Ct. at 2513. But where a faithful examination of the record establishes that no genuine issue of material fact exists, this Circuit has noted "the affirmative obligation of the trial judge to prevent 'factually unsupported claims and defenses' from proceeding to trial." *Felty*, 818 F.2d at 1128 (quoting *Celotex Corp.*, 477 U.S. at 323–24, 106 S.Ct. at 2552–53).

Mindful of the above noted standards applicable to the entry of summary judgment, we now turn to the applicable substantive law. Inasmuch as the district court's jurisdiction was invoked on diversity of citizenship grounds, we must look to the substantive law of the forum state to determine the merits of this action. *Andes v. Versant Corp.*, 878 F.2d 147, 150 (4th Cir.1989); Wright, Miller & Cooper, Federal Practice and Procedure: Jurisdiction § 4473 (noting that while sound reasons exist in this area of the law for the creation of federal law applicable to federal and state courts alike, majority of federal courts sitting with diversity jurisdiction refer questions regarding the effects of foreign judgments to the choice of law principles followed by the state in which the court sits).

We note as a preliminary matter that "[t]he Full Faith and Credit Clause of Article IV § 1 of the Constitution of the United States does not apply to foreign judgments." *Andes*, 878 F.2d at 149. The effect to be given foreign judgments has therefore historically been determined by more flexible principles of comity. The United States Supreme Court defined comity in *Hilton v. Guyot*, 159 U.S. 113, 164, 16 S.Ct. 139, 143, 40 L.Ed. 95 (1895), as the

> recognition which one nation allows within its territory to the legislative, executive, or judicial acts of another nation, having due regard both to international duty and convenience, and to the rights of its own citizens or of other persons who are under the protections of its laws.

As noted previously, however, Maryland has adopted the Uniform Foreign Money–Judgments Recognition Act. The Act, which became effective in Maryland on June 1, 1963, "applies to a foreign judgment[5] that is final, conclusive, and enforceable where rendered even though an appeal is pending or it is subject to appeal." § 10–702. The Act does, however, provide a number of grounds, some mandatory and others discretionary, for nonrecognition which are listed in § 10–704 as follows:

> (a). A foreign judgment is not conclusive if:

---

5. § 10–701(b) defines "foreign judgment" as "any judgment of a foreign state granting or denying recovery of a sum of money. It does not mean a judgment for taxes, fine, or penalty, or a judgment for support in matrimonial or family matters."

(1) The judgment was rendered under a system which does not provide impartial tribunals or procedures compatible with the requirements of due process of law;

(2) The foreign court did not have personal jurisdiction over the defendant; [6]

(3) The foreign court did not have jurisdiction over the subject matter; or

(4) The judgment was obtained by fraud.

(b) A foreign judgment need not be recognized if:

(1) The defendant in the proceedings in the foreign court did not receive notice of the proceedings in sufficient time to enable him to defend;

(2) The cause of action on which the judgment is based is repugnant to the public policy of the State;

(3) The judgment conflicts with another final and conclusive judgment;

(4) The proceeding in the foreign court was contrary to an agreement between the parties under which the dispute was to be settled out of court; [7] or

(5) In the case of jurisdiction based only on service, the foreign court was a seriously inconvenient forum for the trial of the action.

§ 10–703 of the Act provides that:

·Except as provided in § 10–704, a foreign judgment meeting the requirements of § 10–702 is conclusive between the parties to the extent that it grants or denies recovery of a sum of money. The foreign judgment is enforceable in the same manner as the judgment of a sister state which is entitled to full faith and credit.

The Maryland Court of Special Appeals has stated that

the Uniform Foreign Money–Judgments Recognition Act was intended to promote principles of international comity by assuring foreign nations that their judgments would, under certain well-defined circumstances, be given recognition by courts in states which have adopted the Uniform Act. As reciprocity is generally an important consideration in determining whether the courts of one country will recognize the judgments of the courts of another ... the certainty of recognition of those judgments provided for by the Act will hopefully facilitate recognition of similar United States' judgments abroad.... The Act, therefore delineates a *minimum* of foreign judgments which *must* be recognized in jurisdictions which have adopted the Act, and in no way constitutes a *maximum* limitation upon foreign judgments which *may* be given recognition apart from the Act.

*Wolff v. Wolff,* 40 Md.App. 168, 389 A.2d 413, 417 (1978), *aff'd,* 285 Md. 185, 401 A.2d 479 (1979); *accord Bank of Montreal v. Kough,* 430 F.Supp. 1243, 1249 (N.D.Cal. 1977), *aff'd,* 612 F.2d 467 (9th Cir.1980) ("[t]he purpose of the Uniform Act was to create greater recognition of the state's judgments in foreign nations ... by informing the foreign nations of particular situations in which their judgments would definitely be recognized").

With this understanding of the Act, we now turn to Ward's first issue on appeal.

### A.

■ Ward essentially raises two arguments in support of his contention that the

---

**6.** § 10–705 proceeds to list a number of instances upon which a foreign judgment may not be refused recognition for lack of personal jurisdiction.

**7.** The district court noted in its order granting summary judgment on Guinness' complaint that Ward had not relied on this provision as a ground for refusing the High Court judgment recognition. We note that if given an ordinary and reasonable construction such provision would indeed appear not to apply to the facts of this case for that part of the High Court litigation involved in the judgment at issue was clear-

ly not contrary to any agreement to settle the parties' dispute out of court inasmuch as such litigation had ended by the entry of the judgment prior to the creation of the alleged settlement agreement. Rather under the facts of the present case it is this litigation, i.e., the Maryland proceedings seeking recognition and enforcement of the High Court judgment, which is contrary to an alleged agreement to settle out of court. *See New Central Jute Mills Co. v. City Trade & Indus., LTD.,* 65 Misc.2d 653, 318 N.Y.S.2d 980, 985 (N.Y.Sup.Ct.1971).

district court erred in ruling that as a matter of law Maryland courts would not consider a post judgment settlement in determining whether a foreign money judgment should be recognized and enforced under the Maryland Uniform Foreign Money–Judgments Recognition Act.

Ward's first argument raises the contention that those bases in the Act which are set forth as grounds for nonrecognition should not be interpreted to be an exclusive list. He then contends, alternatively, in his second argument that even if such list is exclusive, the Act provides an explicit basis upon which the district court should have refused to recognize and enforce the High Court judgment in light of the post judgment settlement—the applicability requirement set forth in § 10–702 that the foreign judgment be "final, conclusive and enforceable where rendered."

More specifically, as to his first argument, Ward contends that the list of grounds for nonrecognition set forth in the Act is meant to establish those factors relating to the nature and character of the foreign proceedings which will either render the foreign judgment nonconclusive or give the recognition court discretion to decline the requested recognition and that such list was not meant to prohibit a party from raising those grounds potentially common to every suit, such as a post judgment settlement, which are not based on the foreign nature of the proceedings.

Furthermore, Ward alleges in support of his first argument that the district court's narrow construction of the Act ignores the fundamental principle that comity does not require the recognition of a foreign judgment which contravenes the public policy of the state in which the recognition court sits. Ward specifically contends in this vein that recognizing and enforcing the High Court judgment would be in direct contravention of Maryland's strong public policy favoring the settlement of lawsuits. *See Welsh v. Gerber Products,* 315 Md. 510, 555 A.2d 486, 493 (1989); *David v. Warwell,* 86 Md.App. 306, 309, 586 A.2d 775, 777 (1991).

Guinness responds to Ward's first argument by raising the statutory canon of construction that "[w]here a statute expressly provides for certain exclusions, others should not be inserted." *Pennsylvania Nat. Mutual Casualty Ins. Co. v. Gartelman,* 288 Md. 151, 416 A.2d 734, 737 (1980). Because the Act carefully delineates several specific grounds for nonrecognition, Guinness accordingly argues that the district court correctly determined that any excluded ground, including a post judgment settlement, is irrelevant to the question of whether the High Court judgment should be recognized and enforced.

Unfortunately, neither the parties' research nor that of ours has uncovered a reported Maryland decision specifically addressing the question of whether additional grounds for nonrecognition other than those specifically provided by the Act may be entertained by a recognition court. We do believe, however, that the Maryland Court of Special Appeals' decision in *Wolff* provides some useful guidance as to how the Maryland appellate courts would view the question. As noted above, the *Wolff* court stated that the purpose of the Uniform Act is to achieve greater recognition of domestic judgments in foreign countries, i.e., reciprocity, by providing those countries with notice of "a *minimum* of [their] judgments which *must* be recognized in jurisdictions which have adopted the Act." *Wolff,* 389 A.2d at 417. It would certainly appear doubtful that this goal could be accomplished if recognition courts were permitted to routinely expand the bases for nonrecognition beyond those specifically enumerated in the Act. Thus, we tend to believe that the Maryland appellate courts would at the very least be extremely hesitant to entertain grounds for nonrecognition other than those specifically provided in the Act, except perhaps in the most exceptional of cases.

As to Ward's argument that such a narrow construction would ignore the legal principle that comity does not require the recognition and enforcement of a foreign judgment which violates the public policy of the recognition state, we note that the Maryland Court of Appeals has stated that

"[d]eclarations of the public policy of the State is normally the function of the legislative branch of government; in discerning that policy, courts consider, as a primary source, statutory ... provisions." *Jones v. Malinowski*, 299 Md. 257, 273 n. 4, 473 A.2d 429 (1984). Thus, to the extent that the Maryland legislature would desire to elevate Maryland's public policy in achieving recognition of domestic judgments by foreign courts through the means of providing notice to foreign countries of a minimum of their judgments which must be recognized by Maryland courts by statutorily narrowing the grounds for nonrecognition of foreign judgments at the expense of other policies of public concern, it would certainly appear competent to do so.

■ Moreover, the Act does provide a limited public policy exception in § 10–704(b)(2) which provides that a foreign judgment need not be recognized if "[t]he cause of action on which the judgment is based is repugnant to the public policy of the State." Inasmuch as causes of action based on breach of fiduciary duty are accepted and common in the State of Maryland, it clearly appears that the cause of action brought by Guinness against Ward in the High Court is not repugnant to Maryland's public policy. Therefore, Ward cannot rely upon the limited public policy exception to recognition provided in the Act and in our view cannot attempt to create a broader one.

A review of the Maryland Act as a whole, however, convinces us that the Maryland Court of Appeals would hold that it was not the intent of the Maryland legislature in enacting the Act to totally prohibit a foreign judgment debtor from raising a post judgment settlement as a defense to a recognition and enforcement action brought by the judgment creditor. More specifically, we conclude that two separate provisions of the Act provide means for a judgment debtor to raise a post judgment settlement, one of which is that provision raised by Ward in his second argument.

As noted above, Ward contends in his second argument that that portion of the applicability provision of the Act, § 10–702, which requires that the foreign judgment be "final, conclusive, and enforceable where rendered" enables him to raise the post judgment settlement. Ward argues in this regard that the post judgment settlement extinguished the High Court judgment by operation of the law governing settlement agreements. Therefore, Ward argues that the High Court judgment was no longer "enforceable where rendered" at the time of the recognition and enforcement proceedings.

The potential effect of a post judgment settlement in extinguishing the judgment and cause of action upon which such judgment was based has long been recognized in this country. *See County of Dakota v. Glidden*, 113 U.S. 222, 225, 5 S.Ct. 428, 429, 28 L.Ed. 981 (1885). More recently, the Maryland Court of Appeals noted "[i]n *Clark v. Elza*, 286 Md. 208, 406 A.2d 922 (1979), ... that there are two somewhat similar, but legally distinct, methods by which parties to an action can resolve their dispute through compromise. They may enter into either a 'substitute contract' or an 'executory accord.'" *Hauswald Bakery v. Pantry Pride Enterprises, Inc.*, 78 Md.App. 495, 553 A.2d 1308, 1311 (1989).

The *Clark* Court, which was faced with "the question of whether an executory oral agreement to settle a pending law suit may be raised as a defense to prevent a plaintiff from pursuing his original cause of action," *Clark*, 286 Md. at 210, 406 A.2d at 923, further explained that

"[t]he term 'accord executory' is and always has been used to mean an agreement for the future discharge of an existing claim by a substituted performance. In order for an agreement to fall within this definition, it is the promised performance that is to discharge the existing claim, and not the promise to render such performance. Conversely, all agreements for a future discharge by a substituted performance are accords executory. It makes no difference whether or not the existing claim is liquidated or unliquidated, undisputed or disputed, except as these factors bear upon the sufficiency of the consideration for some

promise in the new agreement. It makes no difference whether or not a suit has already been brought to enforce the original claim; or whether that claim arises out of an alleged tort or contract or quasi-contract...." [6 *Corbin on Contracts* § 1268 at 71 (1962)] ... On the other hand, where the parties intend the new agreement itself to constitute a substitute for the prior claim, then this substituted contract immediately discharges the original claim. Under this latter type of arrangement, since the original claim is fully extinguished at the time the agreement is made, recovery may only be had upon the substituted contract....

It is often extremely difficult to determine the factual question of whether the parties to a compromise agreement intended to create an executory accord or a substituted contract. However, unless the evidence demonstrates that the new agreement was designed to be a substitute for the original cause of action, it is presumed that the parties each intended to surrender their old rights and liabilities only upon performance of the new agreement. In other words, unless there is clear evidence to the contrary, an agreement to discharge a pre-existing claim will be regarded as an executory accord. *Porter v. Berwyn Fuel & Feed*, 244 Md. 629, 639, 224 A.2d 662 (1966); 15 *Williston on Contracts* § 1847 (3d ed. Jaeger 1972).

*Clark*, 286 Md. at 214, 406 A.2d at 925–26 (citations omitted).

The *Clark* Court specifically rejected those cases holding that an executory accord is unenforceable and not a bar to a suit on the prior claim, stating that

the modern view, and in our judgment the better view, is summarized by 6 *Corbin, supra*, § 1274, p. 104, as follows: "An accord executory does not itself operate as a discharge of the previous claim, for the reason that it is not so intended or agreed. In nearly every case, however, the parties intend that the duty created by the previous transaction shall be suspended during the period fixed for performance of the accord. As long as the debtor has committed no

breach of the accord, therefore, the creditor should be allowed to maintain no action for the enforcement of the prior claim. His right of action should be held to be suspended as the parties intended."

This is also the position adopted by the Restatement of Contracts, Vol. II, § 417 (1932):

"§ 417. AN ACCORD; ITS EFFECT WHEN PERFORMED AND WHEN BROKEN.

Except as stated in §§ 142, 143 with reference to contracts for the benefit of third persons and as stated in § 418, the following rules are applicable to a contract to accept in the future a stated performance in satisfaction of an existing contractual duty, or a duty to make compensation:

(a) Such a contract does not discharge the duty, but suspends the right to enforce it as long as there has been neither a breach of the contract nor a justification for the creditor in changing his position because of its prospective nonperformance.

(b) If such a contract is performed, the previously existing duty is discharged.

(c) If the debtor breaks such a contract the creditor has alternative rights. He can enforce either the original duty or the subsequent contract.

(d) If the creditor breaks such a contract, the debtor's original duty is not discharged. The debtor acquires a right of action for damages for the breach, and if specific enforcement of the contract is practicable, he acquires an alternative right to the specific enforcement thereof. If the contract is enforced specifically, his original duty is discharged...."

Thus, an executory accord does not discharge the underlying claim until it is performed. Until there is a breach of the accord or a justifiable change of position based upon prospective non-performance, the original cause of action is suspended. As long as the "debtor" ... neither breaches the accord nor provides a reasonable basis for concluding that he will not perform, the "creditor" ... has

no right to enforce the underlying cause of action.

\* \* \* \* \* \*

. . . [i]t is logical to hold that executory accords are enforceable. An executory accord is simply a type of bilateral contract. As long as the basic requirements to form a contract are present, there is no reason to treat such a settlement agreement differently than other contracts which are binding. This is consistent with the public policy dictating that courts should "look with favor upon the compromise or settlement of law suits in the interest of efficient and economical administration of justice and the lessening of friction and acrimony." *Chertkof v. Harry C. Weiskittel Co.*, 251 Md. 544, 550, 248 A.2d 373, 377 (1968), *cert. denied*, 394 U.S. 974, 89 S.Ct. 1467, 22 L.Ed.2d 754 (1969).

*Clark*, 286 Md. at 215–219, 406 A.2d at 926–28.[8]

The Maryland Court of Special Appeals in discussing the requirements for a valid accord and satisfaction, i.e., an accord which has been performed or executed, has held that

"Accord and satisfaction is a method of discharging a contract or cause of action, whereby the parties agree to give and accept something in settlement of the claim or demand of the one against the other, and perform such agreement, the 'accord' being the agreement, and the 'satisfaction' its execution or performance."

*Jacobs v. Atlantco Ltd. Partnership*, 36 Md.App. 335, 340–341, 373 A.2d 1255 (1977) (quoting 1 C.J.S., *Accord and Satisfaction*, § 10).

The Maryland Court of Special Appeals has further held that "[e]ven a judgment, which is an undisputed liquidated claim, may be settled by means of an accord and satisfaction." *Barry Properties, Inc. v. Blanton & McCleary*, 71 Md.App. 280, 525 A.2d 248, 251, *cert. denied*, 310 Md. 490, 530 A.2d 272 (1987); *accord Air Power,*

*Inc. v. Omega Equipment Corp.*, 54 Md. App. 534, 538–39, 459 A.2d 1120 (1983). Of course,

a claim which is liquidated and undisputed[, such as a judgment,] is not discharged by acceptance of a lesser sum tendered in full settlement. . . . This is so because "[a] mere agreement to accept less than the real debt would be a *nudum pactum.*" *Geiser v. Kershner*, 4 G. & J. 305, 310. "But if in addition to the part payment there be some other collateral consideration such as in law is sufficient to support a contract, then the agreement to relinquish the residue is not a *nudum pactum.*" *Prudential Ins. Co. v. Cottingham*, 103 Md. 319, 63 A. 359 (1906).

It is equally well settled, however, that even in the case of a liquidated claim, "an acceptance of part of the amount in satisfaction of the whole will bar a recovery of the remainder if the settlement is supported by some consideration additional or collateral to the partial payment. 'Anything which would be a burden or inconvenience to the one party or a possible benefit to the other' may constitute such a consideration; . . . and the compromise of a disputed claim is a familiar and favored basis for an accord and satisfaction." (Citations omitted.) *Scheffenacker v. Hoopes*, 113 Md. 111, 115, 77 A. 130 (1910).

*Air Power*, 459 A.2d at 1122–23 (citations omitted).

██ To the extent that a judgment debtor could establish that a foreign judgment would no longer be enforceable where rendered due to a post judgment settlement we agree that the Act by its very terms would not be applicable to the judgment. Accordingly, we believe that a judgment debtor may appropriately raise a post judgment settlement in this manner as a defense to the recognition and enforcement of a foreign money judgment under the Maryland Act. We stress, however, that in determining the effect of a post judgment

---

**8.** We note as a preliminary matter that English Courts also look with favor on litigants' settlement of their disputes. *See* Halsbury's Laws of England (4th Edition) volume 37, paragraphs 382, 383, and 391.

settlement on the continued enforceability of the judgment the "where rendered" language of this provision would appear to require a recognition court to focus on the law of the rendering country in making such determination. Thus, if an appropriate court of the rendering country has not addressed the issue of whether the judgment is still enforceable under its law, the recognition court would need to examine and apply the law of the foreign country in this regard.

The other provision of the Uniform Recognition Act which we believe permits a foreign judgment debtor to raise a post judgment settlement as a defense is that portion of § 10–703 which provides that a "foreign judgment is enforceable in the same manner as the judgment of a sister state which is entitled to full faith and credit." While this provision could perhaps be narrowly construed to only state that those same enforcement remedies and procedures available for sister state judgments shall be used to enforce foreign money-judgments which are entitled to recognition, we believe in light of the statutory language taken as a whole and the Maryland law existing at the time of the statute's enactment, that the most reasonable interpretation of the provision not only encompasses the above stated narrow procedural aspects but also indicates that a foreign money judgment entitled to recognition is only enforceable to the same extent that a sister state judgment entitled to

full faith and credit would be under the same circumstances. Thus, we believe that any defenses and counterclaims which could be raised regarding the judgment's enforcement, as opposed to its recognition, if the judgment was that of a sister state and entitled to full faith and credit may also be raised against the enforcement of the foreign judgment. Accordingly, we find that a foreign judgment debtor may raise a post judgment settlement under § 10–703 as a defense not to the recognition of the judgment but rather to its enforcement or degree thereof.[9]

Maryland courts have recognized that "questions of whether a court should recognize a foreign decree, and whether it should go further and use equitable remedies to enforce a decree once recognized are, of course, two separate and distinct lines of inquiry." *Wolff,* 389 A.2d at 415 n. 3. And while the Uniform Recognition Act provides a basis in law for enforcing foreign money judgments which are entitled to recognition thereunder, nowhere does the Act dictate that where such a judgment is entitled to recognition it must automatically and unconditionally be enforced. Thus, we believe Maryland courts would continue to acknowledge that under the Act questions of whether a judgment should be recognized are distinct and separate inquiries from those concerning whether such a judgment once recognized is entitled to enforcement.[10]

**9.** While the goal of reciprocity might arguably not be advanced as far without mandatory enforcement, we nonetheless believe that such goal as well as the principles of comity are still sufficiently served by the fact that judgments which are not enforceable might still be entitled, if consistent with the Act's criteria, to recognition; for a finding of recognition establishes that such judgment is conclusive between the parties and will be given *res judicata* and collateral estoppel effect by the recognition court. Additionally maintaining the distinction between recognition and enforceability would also appear to enable courts to more adequately balance the interests of the rendering and recognition courts where such interests are arguably conflicting by allowing the recognition court to both respect principles of comity through recognition of the foreign judgment but yet avoid unnecessarily the subserviency of its own laws and public policies otherwise applicable regard-

ing the enforcement of such judgments. Thus, in close cases the ability of a recognition court to recognize a foreign judgment but yet refuse to enforce it might lead to the recognition of greater numbers of foreign judgments and correspondingly fewer instances of recognition courts broadly and expansively interpreting the Uniform Recognition Act's grounds for nonrecognition at the expense of unnecessarily endangering the goal of reciprocity behind the Act.

**10.** In *Victrix S.S. Co., S.A. v. Salen Dry Cargo A.B.,* 65 B.R. 466 (S.D.N.Y.1986), aff'd, 825 F.2d 709 (2d Cir.1987), the United States District Court for the Southern District of New York was faced with the question of whether it should recognize and enforce a British judgment, which was contrary to Swedish Bankruptcy proceedings, under New York's version of the Uniform Recognition Act. The district court

In *Coane v. Girard Trust Co.*, 182 Md. 577, 583, 35 A.2d 449, 452 (1944), the Maryland Court of Appeals was confronted with an action on a Pennsylvania judgment entitled to full faith and credit and noted that

> [a] defendant in an action based on a judgment against him may file a special plea setting up the defense of complete or partial release, or payments made since the rendition of the judgment. 2 Poe, *Pleading and Practice*, sec. 404C; 3 *Freeman on Judgments*, 5th Edition, sec. 1461; *Dyal v. Dyal*, 65 Ga.App. 359, 16 S.E.2d 53 (1941).

Consistent with the *Coane* Court's ruling, the Maryland Court of Special Appeals has more recently noted that a judgment debtor seeking to enforce a post judgment accord and satisfaction need not bring a separate contract action but rather can raise such settlement in the action to enforce the judgment. The Court concluded that such a procedure was consistent with Maryland Rules of Procedure which permitted a judgment debtor to establish by motion that a judgment has been satisfied. Moreover, the Court held that a judgment debtor may so attempt to show that the judgment has been satisfied in either the court in which proceedings to enforce the judgment are pending or in the court which rendered the judgment. *Barry Properties*, 525 A.2d at 253–54.

While it is true as contended by Guinness that the *Barry Properties* case did not deal explicitly with a foreign money judgment sought to be recognized and enforced under the Uniform Recognition Act, it is also true that such case in no way suggests that its reasoning is solely limited to Maryland judgments. Moreover, as noted above, the rationale of *Barry Properties* appears to be consistent with that in *Coane* which did involve a sister state judgment entitled to full faith and credit. Inasmuch as a foreign money judgment entitled to recognition under the Act is enforceable in the same manner as a sister state judgment entitled to full faith and credit, we see no persuasive reason to conclude that the *Coane* and *Barry Properties* cases, and the rationale expressed therein, are irrelevant to our present determination.

We believe that this conclusion is further buttressed by Maryland's adoption of the Uniform Enforcement of Foreign Judgments Act, Md.Code Ann., Courts and Jud. Proc. Art., § 11–801 *et seq.*, which became effective in Maryland on July 1, 1987. *See Weiner v. Blue Cross of Maryland, Inc.*, 730 F.Supp. 674, 677 (D.Md.1990), *aff'd*, 925 F.2d 81 (4th Cir.), *cert. denied*, —— U.S. ——, 112 S.Ct. 69, 116 L.Ed.2d 43 (1991). The Uniform Enforcement Act was generally adopted to streamline and make uniform among the those states adopting it the procedure for enforcing foreign judgments. In *Weiner*, then District Judge Niemeyer noted that

> [u]nder the common law, the procedure to enforce the judgment of one jurisdiction in another required the filing of a new suit in the second jurisdiction to enforce the judgment of the first. The suit on the judgment was an independent action....

\*　　\*　　\*　　\*　　\*　　\*

initially noted that "... comity cannot require enforcement of a foreign judgment where a domestic judgment would not be enforced." *Victrix*, 65 B.R. at 469. After determining that the Second Circuit would extend comity to the Swedish Bankruptcy proceedings, the district court concluded that the English judgment would not be entitled to enforcement stating that the "[p]laintiff argues that non-enforcement of the London judgment is itself a violation of comity. We disagree. While comity may require recognition of the London judgment—meaning that we may be required to give it res judicata and collateral estoppel effect—recognition is not the same as enforcement." *Id.* at 470.

On appeal, without any express indication that it was reversing the district court's noted distinction between recognition and enforcement, and without any explanation for its conclusion, the Second Circuit noted that "[t]he Act requires a court to enforce a 'conclusive' and valid foreign money judgment subject to seven discretionary bases for nonenforcement, N.Y.Civ.Prac.L. & R. 5304(b)." *Victrix*, 825 F.2d at 715. To the extent that such statement was meant to reverse the distinction noted by the district court and to the further extent that such conclusion was not dictated by any significant distinction between the New York Uniform Recognition Act and the Maryland Uniform Recognition Act, we do not find the Second Circuit's conclusion persuasive.

When originally written, the Uniform Enforcement of Foreign Judgments Act was not intended to alter the rights of debtors vis-a-vis their judgment creditors. As stated in the Commissioner's Prefatory Note to the Uniform Enforcement of Foreign Judgments Act of 1948, "By this act procedure is made available under which the judgment creditor can effectively obtain relief and at the same time *adequate protection is given the judgment debtor to present any defense that can now be interposed to an action on such judgment."* 9A U.L.A. at 474 (1965) (emphasis supplied). It would thus appear that the Act was designed as a facilitating device....

When the Uniform Enforcement Act was revised in 1964, the procedure was modified to parallel that established by 28 U.S.C. § 1963, which allows a prevailing party to enforce a federal district court judgment by registering it in another federal district. *See* Commissioner's Prefatory Note 9A U.L.A. at 486–87 (1965)....

\* \* \* \* \* \*

While the Uniform Enforcement Act eliminates the need for filing of a complaint and following other procedures, it does not purport to alter any substantive rights or defenses that otherwise would be available either to the judgment creditor or the judgment debtor if suit were filed to enforce that foreign judgment....

*Id.* at 676–77 (citations omitted).

§ 11–802(a) of the Uniform Enforcement Act addresses the proper procedure and location for the filing of a foreign judgment. § 11–802(b) then discusses the effect of a properly filed foreign judgment stating that "[a] filed foreign judgment *has the same effect and is subject to the same procedures, defenses, and proceedings for reopening, vacating, staying, enforcing, or satisfying as a judgment of the court in which it is filed."* (Emphasis added).

It should be noted that the Uniform Enforcement Act defines "foreign judgment" differently than does the Uniform Recognition Act. § 11–801 of the Uniform En-

forcement Act provides that a " 'foreign judgment' means a judgment, decree, or order of a court of the United States or of any other court that is entitled to full faith and credit in this State." As noted previously, the full faith and credit clause of the United States Constitution does not apply to the judgments of a foreign country. *Andes,* 878 F.2d at 149. Accordingly, based on this factor a number of courts in other jurisdictions adopting the Uniform Enforcement Act have held that the Act does not apply to foreign country judgments as opposed to sister state or federal court judgments. *See Multibanco Comermex, S.A. v. Gonzalez,* 129 Ariz. 321, 630 P.2d 1053 (1981); *Medical Arts Building Limited v. Eralp,* 290 N.W.2d 241, 246 (N.D.1980); *Biel v. Boehm,* 94 Misc.2d 946, 406 N.Y.S.2d 231, 233 (N.Y.Sup.Ct.1978).

Unfortunately, there appears to be no reported Maryland case discussing whether the Maryland Uniform Enforcement Act applies to foreign country judgments. Accordingly, if a determination of this issue was necessary to this appeal we would be faced with the task of faithfully predicting how the highest court of Maryland would decide the issue. In that event, had Maryland not adopted the Uniform Recognition Act, we would certainly agree that under Maryland law the Uniform Enforcement Act is inapplicable to a judgment of a foreign country. However, Maryland has adopted the Uniform Recognition Act, and, as noted above, such Act provides that a judgment of a foreign country which is entitled to recognition is enforceable in the same manner as a sister state judgment entitled to full faith and credit. Inasmuch as Maryland has adopted the Uniform Enforcement Act to provide the manner in which a sister state judgment is enforceable, we see no persuasive reason to conclude that the Uniform Enforcement Act is not applicable to a foreign country judgment once such judgment has been found to be entitled to recognition under the Uniform Recognition Act.

In such instance, the two Acts, or at least relevant portions thereof, would appear to be complementary rather than mu-

tually exclusive. *See Hennessy v. Marshall,* 682 S.W.2d 340 (Tex.Ct.App.1984). Moreover, the Commissioner's Comment following Section 3 of the Uniform Recognition of Foreign Money–Judgments Act [11] provides that "[t]he method of enforcement will be that of the Uniform Enforcement of Foreign Judgments Act of 1948 in a state having enacted that Act" and accordingly would appear to establish that this position is at least consistent with the understanding of the Commissioner of the Uniform Recognition Act. Uniform Foreign Money–Judgments Recognition Act, 13 U.L.A. 261, 265 (1986); *Accord* Von Mehren & Patterson, *Recognition and Enforcement of Foreign Country Judgments in the United States,* 6 Law & Policy in International Business 37, 72–73 (1974).

■ We need not, however, conclusively determine this issue nor the corollary issue of whether Guinness erred in failing to seek enforcement of the High Court judgment under Maryland's adoption of the Uniform Enforcement Act for Maryland's Uniform Enforcement Act provides in § 11–805(b) that a "judgment creditor retains the right to bring an action to enforce a judgment instead of proceeding under this subtitle." Nonetheless, we believe that in regard to our analysis set forth above concerning Ward's second argument, the language of § 11–805(b) of the Uniform Enforcement Act when it is remembered that the Act was designed merely as a facilitating device and was not intended to alter any substantive rights or defenses which would otherwise be available to a judgment creditor or judgment debtor in an action for enforcement of a foreign judgment, supports our conclusion that any defenses ordinarily available to the enforcement of a Maryland judgment, *see Barry, supra,* and accordingly a sister state judg-

ment which is entitled to full faith and credit, *see Coane, supra,* is also available to the enforcement of a foreign country judgment which is entitled to recognition under the Uniform Recognition Act and thus enforceable in the same manner as a sister state judgment which is entitled to full faith and credit pursuant to § 10–703.

Accordingly, to the extent that the district court concluded as a matter of law that a judgment debtor cannot raise a post judgment settlement under Maryland's Uniform Recognition Act as a defense or counterclaim to the recognition and/or enforcement of a foreign money judgment because such a ground is not one of the express bases listed in § 10–704 of the Act as grounds for nonrecognition, we believe it erred in ignoring the possible applicability of the above quoted sections.

Upon examining the record before us, it appears that while noting that the parties had definitely engaged in settlement negotiations in the case *sub judice* and in fact had entered into a tentative letter agreement, in light of its holdings that Ward could not raise such a settlement under the Uniform Recognition Act and was furthermore barred by *res judicata* from doing so, the district court never decided whether the parties had ever reached a binding settlement agreement, whether it be a substitute contract, executory accord or accord and satisfaction,[12] written or oral. A review of the record indicates that it is not sufficiently developed in this regard for this Court to determine the issue.

■ Evidence regarding many necessary factual details is absent from the record, not the least of which is information as to the location where a binding settlement

---

11. § 3 of the Uniform Act is codified in Maryland as § 10–703 and provides, as set out above, in relevant part that "[t]he foreign judgment is enforceable in the same manner as the judgment of a sister state which is entitled to full faith and credit."

12. We do note that inasmuch as the alleged settlement agreement appears to have never been performed or executed, it is doubtful that

an accord and satisfaction would initially be found. The fact that Ward has termed such agreement to be an accord and satisfaction would not be controlling over what the actual intent or actions of the parties demonstrate. If an executory accord was found to exist and specific performance ordered an accord and satisfaction would then exist once such accord was performed or executed.

was allegedly reached.[13] Nor is it apparent from the record whether any party discussed before the district court the effect of a post judgment settlement on the underlying judgment under English law. As noted above, inasmuch as § 10–702 contains the language "where rendered," this question would appear to be critical to a determination of Ward's claim that the High Court judgment is not entitled to either recognition or enforcement under the Uniform Recognition Act because it is no longer enforceable where rendered.

Thus, if this were the sole issue on appeal regarding the right of Ward to raise the alleged post judgment settlement as a defense and counterclaim to Guinness' action seeking recognition and enforcement of the High Court judgment, there would be a basis upon which to remand the case to the district court for further proceedings. However, we now turn to Ward's second and related issue on appeal which we believe is dispositive of Ward's right to raise the post judgment settlement.

### B.

The district court concluded that Ward was barred by the doctrine of *res judicata*[14] from raising the alleged post judgment settlement both as a defense and counterclaim because he could have raised such settlement in the British courts. The district court concluded that part of its August 24, 1990, order addressing Ward's contentions regarding the post judgment settlement by stating that

[t]he purpose of the Maryland Uniform Foreign MoneyJudgment Act is to facilitate recognition of foreign judgments.

To permit parties to relitigate the merits of the foreign proceeding would completely contravene the purpose of the Act. The Court finds that the issues which Ward raises regarding the alleged agreement are the type of issues which should not be litigated in the recognition court, but rather should have been addressed to the court rendering the decision on the merits. Ward's proposed collateral attack on the British judgment is precisely the type of relitigation of the foreign judgment the Act was intended to prevent. Accordingly, the Court must decline to deny summary judgment on the basis on [sic] the alleged settlement.

The district court reiterated a portion of the above quote in its October 2, 1990, order granting summary judgment for Guinness on Ward's counterclaim and then stated that "[a] matter is res judicata if it was or could have been brought in a prior litigation. This Court's August 24 Order leads clearly to the conclusion that Ward's counterclaim should have been brought in the prior proceeding."

We disagree with the district court's application of the doctrine of *res judicata* to the case *sub judice* for the following reasons.

In addressing principles of estoppel by judgment, the United States Supreme Court has stated that

[s]imply put, the doctrine of res judicata provides that when a final judgment has been entered on the merits of a case, "[i]t is a finality as to the claim or demand in controversy, concluding parties and those in privity with them, not only as to every matter which was offered

---

13. This detail is particularly necessary for conflicts of law purposes. As to choice of law questions regarding contract issues, Maryland courts generally follow the lex loci contractus approach and thus hold that while the law of the forum governs the remedy for breach of contract, the law of the place of contracting governs questions regarding the nature, validity and construction of a contract unless such law would violate a strong public policy of Maryland. *Traylor v. Grafton*, 273 Md. 649, 660, 332 A.2d 651 (1975); *Bethlehem Steel Corp. v. G.C. Zarnas and Co., Inc.*, 304 Md. 183, 187–89, 498 A.2d 605, 607–08 (1985).

14. *Res judicata* effect has, of course, traditionally been afforded foreign country judgments entitled to recognition consistently with principles of comity. The Maryland Uniform Recognition Act, itself, codifies such principles by indicating in § 10–703 that "[e]xcept as provided in § 10–704, a foreign judgment meeting the requirements of § 10–702 is conclusive between the parties to the extent that it grants or denies recovery of a sum of money. The foreign judgment is enforceable in the same manner as the judgment of a sister state which is entitled to *full faith and credit.*" (*Emphasis added*).

and received to sustain or defeat the claim or demand, but as to any other admissible matter which might have been offered for that purpose." *Cromwell v. County of Sac,* 94 U.S. 351, 352, 24 L.Ed. 195 (1877). The final "judgment puts an end to the cause of action, which cannot again be brought into litigation between the parties upon any ground whatever." *Commissioner v. Sunnen,* 333 U.S. 591, 597, 68 S.Ct. 715, 719, 92 L.Ed. 898 (1948). *See Chicot County Drainage District v. Baxter State Bank,* 308 U.S. 371, 375, 378, 60 S.Ct. 317, 319, 320, 84 L.Ed. 329 (1940).

*Nevada v. United States,* 463 U.S. 110, 129–30 [103 S.Ct. 2906, 2917–18, 77 L.Ed.2d 509] (1983) (footnote omitted); *accord Allen v. McCurry,* 449 U.S. 90, 94 [101 S.Ct. 411, 414, 66 L.Ed.2d 308] (1980); *Federal Deposit Ins. Corp. v. Jones,* 846 F.2d 221, 234–35 (4th Cir.1988); *Kenny v. Quigg,* 820 F.2d 665, 669 (4th Cir.1987); *Welsh,* 555 A.2d at 489; *MPC, Inc. v. Kenny,* 279 Md. 29, 32, 367 A.2d 486 (1977); *Alvey v. Alvey,* 225 Md. 386, 390, 171 A.2d 92 (1961).

English Courts have long subscribed to a similar definition of *res judicata,* noting that

[t]he plea of *res judicata* applies, except in special cases, not only to points upon which the Court was actually required by the parties to form an opinion and pronounce a judgment, but to every point which properly belonged to the subject of the litigation, and which the parties, ex-

ercising reasonable diligence, might have brought forward at the time.

*Henderson v. Henderson,* 3 Hare 100, 115 (1843); [15] *see Bank of Montreal v. Kough,* 612 F.2d 467, 472 (9th Cir.1980).

It appears clear in this case, however, that Ward could not have raised the alleged settlement agreement before the High Court prior to its entry of judgment for such agreement did not occur until after the judgment had been entered. This Circuit has noted that

... a prior judgment "cannot be given the effect of extinguishing claims which did not even exist and which could not possibly have been sued upon in the previous case." *Lawlor v. National Screen Service Corp.,* 349 U.S. 322, 328, 75 S.Ct. 865, 868, 99 L.Ed. 1122 (1955); *see also Harnett* [*v. Billman* ], 800 F.2d [1308] at 1313 [4th Cir.1986], *cert. denied* [480] U.S. [932], 107 S.Ct. 1571, 94 L.Ed.2d 763 (1987) ] (existence of present claim at time of prior suit is determinative for res judicata purposes).

*Kenny,* 820 F.2d at 669. Clearly, Ward's attempt to enforce an alleged post judgment settlement is an entirely different cause of action from that asserted by Guinness against Ward in the High Court for alleged breach of fiduciary duty and could not have been raised as a defense or counterclaim to Guinness' action in that regard because it did not exist prior to the entry of final judgment on that claim. *See id.*[16]

---

**15.** As noted previously, Guinness supported its motions for summary judgment in part with an affidavit of its British barrister. It is interesting to note that Guinness' barrister does not attempt to argue in such affidavit that Ward would now be barred from raising such post judgment settlement, as opposed to other defenses Ward raised to Guinness' complaint seeking recognition and enforcement, in England due to the doctrine of *res judicata,* but rather relies on distinct and separate election theories in such regard. Because we conclude for reasons to be discussed, *infra,* that judicial estoppel bars Ward from raising such post judgment settlement, we need not determine whether the election theories discussed by Guinness' barrister would also apply.

**16.** Guinness cites several cases including *Ingersoll Milling Machine Co. v. Granger,* 833 F.2d

680 (7th Cir.1987); *Porisini v. Petricca,* 90 A.D.2d 949, 456 N.Y.S.2d 888 (1982); and *Federal Deposit Insurance Corp. v. Jones,* 846 F.2d 221 (4th Cir.1988), the latter of which the district court found controlling, in support of its contention that the doctrine of *res judicata* would bar Ward from raising the post judgment settlement agreement in the district court. We will not discuss these cases in detail for we agree with Ward that such cases are distinguishable in that they all involved settlement agreements, or legal theories such as promissory or equitable estoppel resulting from the parties' actions or promises concerning alleged agreements, which existed prior to the entry of final judgment and thus either were or could have been raised in the prior proceeding before the court of original jurisdiction.

As stated by the United States Supreme Court in *Milwaukee County v. M.E. White Co.*, 296 U.S. 268, 275, 56 S.Ct. 229, 233, 80 L.Ed. 220 (1935), "[a] cause of action on a judgment is different from that upon which the judgment was entered." *Accord Huron Holding Corp. v. Lincoln Mine Operating Co.*, 312 U.S. 183, 194, 61 S.Ct. 513, 518, 85 L.Ed. 725 (1941). The Court then noted that

> ... [i]n a suit upon a money judgment for a civil cause of action, the validity of the claim upon which it was founded is not open to inquiry, whatever its genesis. Regardless of the nature of the right which gave rise to it, the judgment is an obligation to pay money in the nature of a debt upon a specialty. Recovery upon it can be resisted only on the grounds ... that *it has ceased to be obligatory because of payment or other discharge....*

*Milwaukee County*, 296 U.S. at 275, 56 S.Ct. at 233 (citations omitted) (emphasis added); *accord Sun First Nat. Bank v. Gainsville, 75 LTD.*, 155 Ga.App. 70, 270 S.E.2d 293, 296 (1980); *Bahr v. Bahr*, 85 S.D. 240, 180 N.W.2d 465, 467 (1970); *Crescent Hat Co. v. Chizik*, 223 N.C. 371, 26 S.E.2d 871, 872 (1943).

We believe that the factors in this case which have caused confusion among the parties and the district court are the pendency of Ward's appeal before the British Court of Appeal at the time the alleged settlement was reached and his subsequent decisions to continue his appeal when Guinness breached the alleged settlement agreement and to not inform the British appellate courts of such settlement. We believe that these factors when combined do indeed lead to Ward being estopped or precluded from raising the alleged settlement agreement in this litigation but we do not believe that they technically do so on *res judicata* grounds.

In attempting to show why we reach this conclusion we note our initial belief that had Ward completed his unsuccessful appeals through the British appellate system, or had his time to appeal the High Court judgment run without his ever doing so, before the parties ever reached a binding settlement agreement there could certainly be no argument that *res judicata* would bar him from asserting the alleged post judgment settlement as a defense and/or counterclaim[17] to a subsequent attempt by Guinness to have the judgment recognized and enforced in Maryland. Clearly, under this set of facts Ward's attempt to raise the post judgment settlement would not be a collateral attack on the High Court judgment. As noted by the Maryland Court of Special Appeals in *Barry Properties*, such an attempt

> ... does not constitute a prohibited collateral attack on the judgment. A collateral attack on a judgment is "an attempt to impeach the judgment by matters dehors the record ... to avoid, defeat, or evade it or deny its force and effect, in some incidental proceeding not provided by law for the purpose of attacking it." *Klein v. Whitehead*, 40 Md.App. 1, 20–21, 389 A.2d 374 (1978). *See Board v. Baden Volunteer Fire Dept.*, 257 Md. 666, 670–71, 264 A.2d 844 (1970). The validity of the confessed judgment has never been assailed in those proceedings. Appellant merely seeks to have it declared satisfied. The proceedings, therefore, are in recognition of the judgment. *See Rehm v. Fishman*, 395 S.W.2d 251, 256 (Mo.1965).

---

17. *See also Fairfax Countywide Citizens v. Fairfax County*, 571 F.2d 1299, 1305 (4th Cir.), *cert. denied*, 439 U.S. 1047, 99 S.Ct. 722, 58 L.Ed.2d 706 (1978); *Harman v. Pauley*, 678 F.2d 479, 481 (4th Cir.1982); *United States v. American Nat. Bank and Trust Co.*, 101 F.R.D. 770, 771–72 (N.D.Ill.1984) (Courts noting in cases involving a party's attempt to reopen a case pursuant to Fed.R.Civ.P. 60(b)(5) to enforce prejudgment settlements which resulted in dismissal of the cases that these attempts to enforce such settlements are normally separate causes of action and that the parties should more appropriately bring separate actions to so enforce in either an appropriate federal court, if grounds for jurisdiction exist, or state court; unless the terms of such settlements were expressly incorporated in the district court's dismissal order).

*Barry Properties,* 525 A.2d at 254.[18]

We now turn to the question of whether Ward's attempt to raise the post judgment settlement becomes a prohibited collateral attack due to the fact of his pending appeal in the British system. Our research reveals that a post judgment settlement of the litigants' relevant disputes reached during the pendency of an appeal will generally result in at least the dismissal of the appeal. Where a post judgment settlement truly renders the parties' disputes moot, this Circuit as well as Maryland State appellate courts have not hesitated to not only dismiss the parties' appeal but also have vacated the judgment on appeal and remanded the case with instructions for the trial court to dismiss the case. *See Kennedy v. Block,* 784 F.2d 1220, 1222–24 (4th Cir.1986) (This Court noting that "[t]he Constitution authorizes federal courts to hear cases and controversies, U.S. Const. art. III, § 2, and by that limitation forbids the consideration by federal courts of matters that have become moot. *Powell v. McCormack,* 395 U.S. 486, 496 n. 7, 89 S.Ct. 1944, 1950 n. 7, 23 L.Ed.2d 491 (1969). '[A] case is moot when the issues presented are no longer "live" or the parties lack a legally cognizable interest in the outcome.' *Id.* at 496, 89 S.Ct. at 1951."); *Area Development Corp. v. Free State Plaza, Inc.,* 254 Md. 269, 254 A.2d 355 (1969) (Maryland Court of Appeals holding that a post judgment settlement rendered the case moot); *Lloyd v. Board of Supervisors of Elections,* 206 Md. 36, 111 A.2d 379, 381 (1954) (Maryland Court of Appeals holding that question of mootness is generally based in Maryland on rule of decision that courts generally "... do not sit to decide abstract questions of law," as opposed to being based on constitutional principles); *see also Federal Data Corp. v. SMS Data Products Group, Inc.,* 819 F.2d 277 (Fed.Cir. 1987); *Nestle Co., Inc. v. Chester's Market, Inc.,* 756 F.2d 280 (2d Cir.1985). In such a case, the vacated judgment generally has

no *res judicata* effect. Wright, Miller & Cooper, Federal Practice and Procedure: Jurisdiction §§ 3533.10 and 4433.

Other courts routinely dismiss the appeal but refuse to vacate the underlying judgment. For instance, the Seventh Circuit has held that

[a] settlement while the case is on appeal is a reason why the losing party no longer wants the judgment reversed. The case is neither more nor less moot than it would be if the loser were satisfied with the judgment and complied without appealing. Cf. *CFTC v. Chicago Board of Trade,* 701 F.2d 653, 657 (7th Cir.1983). Compliance does not require the judgment to be set aside; compliance in part (the upshot of a settlement) should not be treated differently.... [*United States v.*] *Munsingwear*[, 340 U.S. 36, 71 S.Ct. 104, 95 L.Ed. 36 (1950)] holds that the judgment in a moot case should be vacated to relieve the parties of collateral consequences when they were unable to obtain appellate review. [In the case of a post judgment settlement pending appeal, appellants are] not disabled from obtaining review; they have simply chosen, for reasons they deem sufficient, to forego the entitlement they possess.

*Matter of Memorial Hosp. of Iowa County, Inc.,* 862 F.2d 1299, 1301 (7th Cir.1988). The Seventh Circuit also concluded in *Memorial Hosp.* that lower court decisions as public acts of public officials are not the parties' property and therefore may not properly be used as bargaining chips in the process of settlement. Rather, the Seventh Circuit stated that if parties desire to avoid the potential stare decisis and preclusive effects of such judgments they need only settle before such decisions are rendered. *Id.* at 1302.

More flexible approaches, however, have been adopted by a number of courts. An example of one of these approaches is found in the Ninth Circuit which, when

---

**18.** Although we believe that the alleged post judgment settlement is in recognition of the High Court's final judgment, for reasons to be discussed, *infra,* we believe that such agreement was in direct contradiction of Ward's right to appeal such judgment through the British appellate courts; thus, creating an appropriate situation for the application of the doctrine of judicial estoppel as opposed to *res judicata.*

confronted with the post judgment settlement, dismisses the appeal and remands the case to the lower court to determine whether its judgment should be vacated by balancing the various equities and hardships presented. *See National Union Fire Ins. Co. v. Seafirst Corp.*, 891 F.2d 762, 765–69 (9th Cir.1989).

As noted previously, the parties have not specifically discussed the effect under British law of a post judgment settlement on the underlying judgment. We note, however, that such a settlement will apparently at least normally result in the dismissal of the appeal. *See National Benzole Co., LTD. v. Gooch* [1961] 3 All E.R. 1097; Halsbury's Laws of England (4th Edition) volume 37, paragraph 692. In fact, as early as 1914, the British Court of Appeal via Lord CozensHardy MR held that "I wish it to be clearly understood that when a case is settled it is the duty of the solicitors to inform the court forthwith." *Wheatley v. Lumley Brick LTD* [1914] WN 346 (the case had been stood over for settlement and when the hearing date arrived no one appeared on either side).

This case, of course, presents the additional factor of the parties not agreeing as to whether a binding settlement was ever reached. As correctly noted by Ward, American appellate courts are courts of limited jurisdiction and are normally bound by the record before them. Accordingly, unless otherwise expressly provided such as by statute, such courts do not act as trial courts and will not normally litigate new matters. *See also Commissioners of Vienna v. Phillips Packing Co., Inc.*, 207 Md. 12, 113 A.2d 89, 92 (1955); Halsbury's Laws of England (4th Edition) volume 37, paragraphs 677 and 693. This, of course, however, does not mean that a party may not present evidence to an appellate court concerning a post judgment settlement, such as a signed settlement agreement, for the United States Supreme Court has long held that appellate courts are "... compelled, as all courts are, to receive evidence dehors the record affecting their proceeding in a case before them on error or appeal." *Glidden*, 113 U.S. at 225, 5 S.Ct.

at 430; *see* Halsbury's Laws of England (4th Edition) volume 37, paragraph 693.

Where the existence or validity of such a settlement, however, is legitimately contested by one of the parties, appellate courts, of course, will not normally act as a court of original jurisdiction and litigate the matter. Rather the appropriate course in such an instance would appear to be that of continuing or staying the appeal so that a competent court may decide the issue. *See Board of Liquidation v. Louisville & N.R. Co.*, 109 U.S. 221, 226–27, 3 S.Ct. 144, 448–49, 27 L.Ed. 916 (1883); *Glidden*, 113 U.S. at 226–27, 5 S.Ct. at 430. This approach appears to be consistent with that taken by British appellate courts. *See National Benzole* 3 All E.R. at 1099 ("If this had been a case where the defendant could have advanced that he wished to impeach that agreement on some recognized grounds, this court might have thought some steps could be taken to leave open the appeal until that matter had been adjudicated on ..."); *Lees v. Motor Insurers' Bureau* [1953] 1 WLR 620, 97 Sol Jo 298, CA (British Court of Appeal noting that the proper order to enter where the parties had reached a post judgment settlement would be one staying the appeal pending enforcement of the agreement); Halsbury's Laws of England, (4th edition) volume 37(3), paragraphs 4128 and 4129.

It appears clear from the willingness of appellate courts to continue and stay appeals so that the existence and validity of post judgment settlements may be litigated, that such litigation is not barred by the underlying judgment. Rather as stressed above litigation to establish the validity and existence of a post judgment settlement is based on a separate cause of action from that decided by the judgment and does not involve an attempt by the parties to relitigate matters which were or could have been decided in the prior proceeding. The fact that the existence of such a settlement may affect the judgment and its continuing effect does not change the reality that such settlement is based on a separate cause of action which could not

have been litigated prior to judgment because of its nonexistence.

As noted previously, the Maryland Court of Special Appeals held in *Barry Properties* that a judgment debtor may raise an alleged accord and satisfaction to establish that a judgment has been satisfied and/or rendered unenforceable in either the rendering court or the enforcing court. It does not appear that the *Barry Properties* Court was faced with a situation where a pending appeal concerning the merits of the judgment existed in the rendering system. However, it is both the majority position among the federal courts and the position adopted by § 10–702 of the Maryland Uniform Recognition Act that the existence of a pending appeal does not render a judgment unenforceable nor suspend its preclusive effects absent a party obtaining a stay from either the rendering or enforcing court. *See* Wright, Miller & Cooper, Federal Practice and Procedure: Jurisdiction § 4433; *see also* Halsbury's Laws of England (4th Edition) volume 37, paragraph 699. And while an appellate court faced with the task of deciding a direct appeal on the merits of a judgment and contemplating continuing or staying such appeal for purposes of permitting litigation concerning the existence or validity of an alleged post judgment settlement may certainly have an interest concerning where and when such litigation is conducted, the affect of this interest on the propriety of the enforcing court litigating the issue would appear to rest more appropriately on principles of comity and the orderly administration of justice recognized by the enforcing court than on the doctrine of *res judicata.*

Whether conducted in English courts or the district court, the litigation of whether a post judgment settlement exists which should be enforced would not have involved a relitigation of issues decided by the High Court or otherwise consisted of an attack on the correctness or validity of the High Court judgment. *See Andes,* 878 F.2d at 149 ("Here, no one seeks to relitigate the bank's claims against Versant or to inquire into anything actually adjudged by the English Court."). Thus, Guinness' argument that procedures existed in England

for Ward to attempt to stay or enjoin enforcement of the judgment pending litigation in the High Court, or another appropriate body, concerning the settlement's existence or validity does not convince us that Ward is now barred by the doctrine of *res judicata* due to his failure to utilize those procedures. Accordingly, we believe that the district court erred in concluding that Ward was barred from raising the alleged post judgment settlement as a defense and counterclaim by the doctrine of *res judicata.*

■ With the above discussion in mind, however, we believe that the more appropriate ground for Ward's estoppel or preclusion becomes apparent. There is no dispute in this case that Ward was to dismiss his appeal in light of the settlement. *See Wood v. Virginia Hauling Co.,* 528 F.2d 423, 425 (4th Cir.1975) ("A settlement agreement by definition should end litigation."); Wright, Miller & Cooper, Federal Practice and Procedure: Jurisdiction §§ 3533.2 and 3533.10. Ward contends that he continued his appeal through the British appellate courts once Guinness breached the settlement for the purpose of mitigating his damages. The requirement that a party mitigate his damages is a fundamental principle of contract law which needs no discussion here. However, we are not here dealing with an ordinary contract action where only the equities concerning the contracting parties or their beneficiaries are involved. Rather, a third party of eminent concern is involved here— an appellate court with limited jurisdiction and powers of review.

Had a settlement been found to exist in this case it appears clear that no dispute would have remained for the exercise of appellate power. By failing to notify the British appellate courts of the alleged settlement so that they could determine what action on their part was appropriate, such as continuing or staying the appeal, we believe that Ward acted inconsistently in such a degree and manner to offend the judicial process and properly preclude him from now raising the alleged post judgment settlement.

That an estoppel can arise because of a prior inconsistent claim or position taken in a judicial proceeding is clear. A party cannot have its cake and eat it too. Although there are several species of estoppel, the court is here dealing with what is generally known as judicial estoppel or the doctrine of preclusion against inconsistent positions. This type of estoppel protects interests different from those protected by equitable estoppel, the type referred to in 31 C.J.S. Estoppel § 117a (1964),.... Equitable estoppel is designed to protect any adversary who may be prejudiced by the attempted change of position. On the other hand, judicial estoppel, or preclusion against inconsistent positions, is designed to protect the integrity of the courts and the judicial process.

An exposition of the modern doctrine of judicial estoppel based upon preclusion against inconsistent positions is found in 1B Moore, Federal Practice, § 0.405[8], at 765–768 (2d ed. 1971) as follows:

"Even where the facts will not permit the application of res judicata, collateral estoppel, or the election rule against inconsistent remedies, a party may be precluded by a prior position taken in litigation from later adopting an inconsistent position in the course of a judicial proceeding. Though the preclusion doctrine is sometimes referred to as 'judicial estoppel' or 'estoppel by oath,' and though it is frequently expressed in language sounding of estoppel in pais, numerous cases illustrate the existence of a doctrine forbidding inconsistent positions, usually as to facts, which operates independently of equitable estoppel."

Many cases forbidding inconsistent positions in judicial proceedings may be grouped conveniently into two classes: those where a party seeks to contradict his own sworn statements made in prior litigation in which he was a party or a witness; and those where the prior inconsistent position was not taken under oath.... Both types of preclusion seem to fall, generically, within a universal judicial reluctance to permit litigants to 'play fast and loose' with courts of justice according to the vicissitudes of self-interest.

\*     \*     \*     \*     \*     \*

The preclusion rule has been held to operate regardless of whether the prior inconsistent position was successfully maintained; and irrespective of reliance by, or prejudice to, the party invoking it. Strangers, as well as parties to the proceeding in which the prior inconsistent position was taken, may take advantage of the preclusion. (Citations omitted.)

*Duplan Corp. v. Deering Milliken, Inc.,* 397 F.Supp. 1146, 1177–78 (D.S.C.1975); *Accord Federal Deposit,* 846 F.2d at 234; *Allen v. Zurich Ins. Co.,* 667 F.2d 1162, 1166–67 (4th Cir.1982);[19] *United Virginia Bank/Seaboard National v. B.F. Saul Real Estate Investment Trust,* 641 F.2d 185, 190 (4th Cir.1981); *Scarano v. Central R. Co.,* 203 F.2d 510, 512–13 (3d Cir.1953).

We believe that Ward in continuing his appeal through the British appellate courts, without informing them of the alleged settlement and seeking a continuance or stay of the appeals, was inherently and explicitly informing them that no events had occurred which would render such appeals improper. In doing so while at the same time and thereafter attempting to raise the post judgment settlement in the recognition and enforcement proceedings here in issue, we conclude that he was clearly "playing fast and loose" and "blowing hot and cold" with the judicial process to such a degree as to violate the "essential integrity" of that process.[20] We, there-

**19.** This Court stated in *Zurich,* 667 F.2d at 1167, that "though perhaps not necessarily confined to situations where the party asserting the earlier contrary position there prevailed, it is obviously more appropriate in that situation." We note here that Ward was successful in the pertinent aspect, i.e., he succeeded in appealing the High Court judgment through the British appellate system as opposed to succeeding in overturning the High Court judgment.

**20.** This Court also noted in *Zurich* that "[a]lthough this is a diversity case, we consider that federal law controls the application of judicial estoppel, since it relates to protection of the integrity of the federal judicial process. We

fore, conclude that Ward is judicially estopped [21] from raising such alleged post judgment settlement in the recognition and enforcement proceedings.[22]

We now turn to the final issue on appeal.

### C.

■ As noted previously, Ward contends as his third issue on appeal that the district court erred in holding that he had failed to raise a genuine issue of material fact to support his contention that the High Court judgment is not entitled to recognition and enforcement under the Maryland Uniform Recognition Act because it was not rendered by a fair and impartial tribunal which utilized procedures compatible with the requirements of due process of law. *See* § 10–704(a)(1). Ward essentially raises on appeal two of the several arguments he relied upon before the district court to establish that the British proceedings where violative of the requirements of due process.

Both of these arguments focus on the *Mareva* injunction issued by Mr. Justice Warner of the High Court. First, Ward contends that the *ex parte* nature of the injunction's entry establishes that it was violative of due process, while, secondly, arguing that the excessive remedies granted in such injunction violated due process.

As noted by Guinness,

the Uniform Act does *not* require that the procedures employed by the foreign tribunal be *identical* to those employed in American courts. The statute simply

requires that the procedures be *"compatible* with the requirements of due process of law." . . . (emphasis supplied). The drafters of the Uniform Act made it clear that "a mere difference in the procedural system is not a sufficient basis for nonrecognition. A case of serious injustice must be involved." Unif. Foreign Money–Judgments Recognition Act § 4 comment, 13 U.L.A. 268 (1986).

*Ingersoll Milling Machine Co. v. Granger,* 833 F.2d 680, 687 (7th Cir.1987) (citation and footnote omitted); *see also Hilton,* 159 U.S. at 205, 16 S.Ct. at 159. "The polestar is whether a reasonable method of notification is employed and reasonable opportunity to be heard is afforded to the person affected." *Somportex LTD. v. Philadelphia Chewing Gum Corp.,* 453 F.2d 435, 443 (3d Cir.1971), *cert. denied,* 405 U.S. 1017, 92 S.Ct. 1294, 31 L.Ed.2d 479 (1972).

■ Consistent with contentions of Guinness, the *Mareva* injunction originated in the case of *Mareva Compania Naviera S.A. v. International Bulk Carriers S.A. "the Mareva",* [1980] 1 All E.R. 213, and is designed to prevent a defendant from dissipating or hiding his assets at the outset of a case thus making any judgment subsequently rendered against him either worthless or difficult to enforce. *See* Halsbury's Laws of England (4th Edition) volume 37, paragraphs 362 and 363. As such, it would appear to be similar to the procedure of obtaining a temporary restraining order utilized in our federal system pursuant to Fed.R.Civ.P. 65(b).

---

think that neither 28 U.S.C. § 1738, the full faith and credit statute, nor *Erie R.R. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), requires inquiry into the possible existence of a conflicting state rule." *Id.* at 1167 n. 4.

**21.** In *Zurich,* this Court noted that while the doctrine of judicial estoppel ". . . was not specifically raised either in the trial court or on appeal, we are satisfied that under the circumstances of its close relationship to the directly contested issue . . . we may properly rely upon it as an alternative basis for affirmance." *Id.* at 1168 n. 5.

In the case *sub judice,* Guinness did raise the doctrine of judicial estoppel to the trial court in its reply in further support of its motion for

summary judgment on Ward's counterclaim. The trial court, however, did not rely upon such ground in granting Guinness' motion. On appeal, Guinness has again raised the doctrine as an alternative ground for affirmance of the district court's judgments.

We note, however, that even if Guinness had not specifically raised the applicability of the doctrine, we, like the Court in *Zurich,* would, hold that its close relationship to other directly contested issues renders its usage as an alternative basis for affirmance appropriate.

**22.** We have examined the parties' other related arguments on this issue and conclude that they are either unavailing or unnecessary for our determination. *See* footnote 15, *supra.*

We find Ward's contention that the *ex parte* nature of Guinness' action in obtaining the *Mareva* injunction violated principles of due process and predisposed the remaining proceedings against him to be without merit. An *ex parte* application for a temporary restraining order is also permitted in our system, accordingly the very fact that such a procedure was used does not automatically result in a violation of due process. *See* Rule 65(b) ("A temporary restraining order may be granted without written or oral notice to the adverse party or that party's attorney only if (1) it clearly appears from the specific facts shown by affidavit or by verified complaint that immediate and irreparable injury, loss, or damage will result to the applicant before the adverse party or that party's attorney can be heard in opposition, and (2) the applicant's attorney certifies to the court in writing the efforts, if any, which have been made to give the notice and the reasons supporting the claim that notice should not be required.").

Rather, a party when confronted with a proper motion for summary judgment on such issue must present "evidence" sufficient to demonstrate the existence of a genuine issue of material fact in such regard. We make no intimations as to what means might have been available for Ward to demonstrate such a genuine issue of material fact, but we do note that the mere placement by Ward and his British barrister of conclusory allegations and speculative assertions into affidavits or declarations without further legitimate support clearly does not suffice. *See Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510; *Ross*, 759 F.2d at 364.

We likewise conclude that Ward's argument that he has demonstrated a genuine issue of material fact concerning § 10–704(a)(1) of the Uniform Recognition Act by contending that the remedies granted by the *Mareva* injunction, set forth earlier in the opinion, in addition to the *ex parte* procedures used to obtain the injunction, violated fundamental principles of due process and created a serious injustice is without merit. As noted by the district court, we are here asked to recognize and enforce the British High Court final judgment and not the *Mareva* injunction issued at the outset of the High Court litigation. The fact that the one or more of the remedies granted in the *Mareva* injunction may have been excessive by American notions will not necessarily establish that the High Court was biased nor that the relevant procedures leading to the entry of the High Court final judgment did not comport with the requirements of due process.

Moreover, the record establishes that Ward was permitted to immediately confront the entry of the injunction and did so through British counsel within 2 days from such entry. *See Mathews v. Eldridge*, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976); *North Georgia Finishing, Inc. v. Di-Chem, Inc.*, 419 U.S. 601, 95 S.Ct. 719, 42 L.Ed.2d 751 (1975); *Arnett v. Kennedy*, 416 U.S. 134, 94 S.Ct. 1633, 40 L.Ed.2d 15 (1974); *Calero–Toledo v. Pearson Yacht Leasing Co.*, 416 U.S. 663, 94 S.Ct. 2080, 40 L.Ed.2d 452 (1974). Several modifications were successfully obtained and additional time to comply permitted. In fact, Ward did not comply in any material fashion with the requirements of the injunction until after he had so appeared. Additionally, he also subsequently informed the High Court that he had previously offered to voluntarily place the disputed payment in escrow. It is thus hard to conceive of a serious injustice being created by the *Mareva* injunction.

As to the remaining procedures in the High Court, Ward continued to be represented by British counsel at all times therein. We cannot find in the record any actions or omissions by the High Court in its proceedings which demonstrate that its procedures failed to comport with the requirements of due process. Furthermore, leave was granted to Ward by the High Court to appeal its judgment to the British Court of Appeal, while leave was also subsequently granted by the Law Lords to appeal the Court of Appeal's decision to the House of Lords even after the Court of Appeal had denied such leave. We, therefore, conclude that the district court correctly decided this issue.

## IV.

Accordingly, we affirm the judgments below, although we reach this conclusion in part by different reasoning.[23]

AFFIRMED.

---

23. We wish to stress that nothing in this opinion is meant to prevent Ward from receiving credit at the time of the judgment's execution for any payment he has so far made to Guinness whether made pursuant to the *Mareva* injunction, the High Court's final judgment, the district court's final judgment, or the alleged settlement agreement. Any other conclusion would unjustly benefit Guinness.